# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

ROBSON 200, LLC, a
Florida Limited Liability Company,

     Plaintiff,

v.                            Case No: 8:20-cv-0161-KKM-JSS

CITY OF LAKELAND, FLORIDA,
LAKELAND CODE ENFORCEMENT
BOARD; ANGELA KAISER, an individual;
and JIM DEHNE, an individual,

     Defendants.

_____

## ORDER

Plaintiff Robson 200, LLC, and the City of Lakeland have frequently clashed over the safety and sanitation conditions at Robson's mobile home park. To date, the City has cited Robson for three violations of the City's Land Development Code (LDC). The first two citations involved septic tank issues in 2017 and 2018 but did not result in fines after the Lakeland Code Enforcement Board (the Board) and the Florida courts dismissed the citations for procedural reasons.

In June 2018, a City official cited Robson a third time for code violations related to the disrepair of a fence on Robson's property and issued Robson a notice detailing the

offending conditions of the fence. Although Robson attempted to make certain repairs after the initial citation, these attempts did not satisfy the City officials. The Board fined Robson $50 per day, effective November 5, 2018, to accrue until Robson brings the fence into compliance. Robson refuses to mend the fence further and thus the fine continues to grow and now exceeds $50,000.

Robson sued the City, the Board, and two City officials, claiming that the fine is unconstitutionally excessive, that the operative code provision is unconstitutionally vague, and that the City officials maliciously prosecuted the two septic tank violations against Robson. The City now moves for summary judgment, arguing that Robson's claims fail as a matter of law. The Court agrees and grants summary judgment.

## I.   BACKGROUND

Robson's claims concern three code-enforcement citations that the City issued to Robson's mobile home park (the Property). (Doc. 53 at 2–3.) The Property contains approximately eighteen septic tanks, each servicing one to four lots. (Doc. 32 at 2.) It is also surrounded by a wooden fence. (Doc. 53 at 3; Doc. 14-5.) Because the City moves for summary judgment, the Court recites the undisputed facts below and notes when disputes of material fact exist.

### A. Code Enforcement Case LCE17-00229

On January 10, 2017, Code Enforcement Officer Susan Stone cited the Property for violations of LDC § 86-4 based on Stone's observations of standing water below a mobile home connected to a septic tank on the Property. (Doc. 53 at 2; Doc. 32 at 2; Doc. 14-1 at 1–2; Doc. 36-1 at 150–56 (photos).) In relevant part, LDC § 86-4 prohibits anyone from allowing "any swill, slops or malodorous or noxious liquids to run, drip or fall into or upon any sidewalk, street, highway, alley, park, lake, stream or other public place." (Doc. 14-1 at 1.) The next day, on January 11, 2017, the Health Department issued an inspection report noting "[r]aw sewage on ground at unit 34 seeping under mobile home. Tank need[s] to be pumped immed[iately]." (Doc. 36-1 at 5–6.) In the following months, Robson had two septic tank companies (Atomic Septic Tank and Averitt Septic Tank) pump the offending tank on separate occasions and provided the City with copies of the invoices. (Doc. 32 at 2–3; Doc. 36-1 at 30–31, 36–39, 43–46.) Stone advised Robson multiple times that a final Health Department inspection must occur to close out the case. (Doc. 36-1 at 28–29.) In correspondence with the Health Department, Robson disputed the need for a final inspection. (*Id.* at 30, 47–49.)

On May 3, 2017, the Board found that the violation remained and imposed a $200 per day fine. (Doc. 53 at 2; Doc. 36-1 at 50.) Robson appealed the Board's decision in state court. (Doc. 53 at 2.) On May 8, five days after the Board's order, Robson's counsel

provided the City with an affidavit from Averitt Septic's project manager, Mike Ingram, stating that the company had pumped the tank on February 2 and found the system was "functioning properly" on April 5. (Doc. 32 at 3; Doc. 36-1 at 64–67.) Following settlement talks, "Stone executed an Affidavit of Compliance and the Board dismissed the case with no fine." (Doc. 32 at 3; Doc. 53 at 2; Doc. 36-1 at 60–61.) Based on the Board's decision to dismiss the case, the state court dismissed Robson's appeal as moot on August 23, 2017. (Doc. 53 at 3; Doc. 14-2; Doc. 30-1 at 137.)

### B. Code Enforcement Case LCE18-03721

In May 2017, Code Enforcement Officer David Anders met with multiple Robson tenants, observed photos of backed-up sewage, smelled sewage, and observed toilet paper around one of the septic tanks. (Doc. 32 at 4; Doc. 37 at 57–58, 62, 79.) Code Enforcement Officer Angela Kaiser also conducted separate inspections, smelled sewage, observed "foul fecal-smelling water" in one of the tenant's bathtubs, and met with multiple tenants who showed her similar photos to those Anders had seen. (Doc. 32 at 4–5; Doc. 34 at 5; Doc. 41 at 219–20.) On June 7, 2018, Kaiser cited Robson for violating LDC § 46-1 due to backed-up sewage under several mobile homes on the Property and problems with several septic tanks. (Doc. 53 at 3; Doc. 32 at 4–5.) LDC § 46-1 bans anyone from "creat[ing], maintain[ing], or contribut[ing] to any condition or circumstance which is deemed prejudicial to the public health, or which is in any manner likely to cause or create any

unhealthful condition in the city." Kaiser advised Robson that the "evidence shows that the septic tanks have been overly full and not draining" and that "[t]he [C]ity asks you as the owner to have them emptied and functioning properly." (Doc. 34-1 at 25.) In response, Robson explained that it could not comply because the City failed to specify which tanks needed to be emptied or repaired. (*Id.*) Without proof from Robson that the tanks had been emptied, Kaiser submitted an affidavit of non-compliance on October 18, 2018. (*Id.* at 27.) In a subsequent order, the Board concluded that Robson remained in violation of LDC § 46-1. (Doc. 34 at 6–7; Doc. 34-1 at 27.) Robson again appealed the Board's order to state court. This time, the state court quashed the Board's order, concluding that the notice of violation did not clearly identify which septic tanks were noncompliant, that subsequent communications were insufficient to properly provide notice to Robson of the specific problem, and that the lack of notice denied Robson due process. (Doc. 14-4 at 2.)

### C. Code Enforcement Case LCE18-04621

On June 28, 2018, Kaiser cited the Property for violations of LDC § 4.4.1(i) due to its "damaged fence" and directed Robson to "replace broken or damaged boards, [and] repair areas of fence where leaning or coming apart." (Doc. 14-5 at 1; Doc. 53 at 3.) LDC § 4.4.1(i) requires all [f]ences and walls, whether required or optional, [to] be maintained in sound condition." (Doc. 14-5 at 1.)

On July 19, Robson sent Kaiser a letter disputing the violation, asserting it had repaired the fence and requesting the case be closed immediately. (Doc. 53 at 3; Doc. 43-1 at 60.) The record includes photos of Robson's fence taken that same day:





(Doc. 30-2 at 16, 24.) Ten days later, Robson notified Code Enforcement Supervisor Jim Dehne (Kaiser's supervisor) by email that it performed additional repairs and attached photos. (Doc. 34-1 at 43–55; Doc. 33 at 4.) After Dehne shared the email with Kaiser, she acknowledged that some work had been done but more was required to bring the fence into compliance. (Doc. 34-1 at 43.) In her follow-up email to Robson, Kaiser attached labeled photos to show the specific issues and the specific boards that needed to be replaced. (*Id.*)

On August 29, Robson emailed Kaiser again, asserting that the part of the fence visible from the street "is intact and vertical." (*Id.* at 60–61.) Kaiser replied that the entire fence needed to comply with the Code, not just the part "visible from the roadside" and asked if Robson was ready for an additional inspection. (*Id.* at 60.) After an additional email exchange where Robson again asserted that the fence was repaired and that the case should be closed, Kaiser repeated that she needed to perform an additional inspection. (Doc. 32 at 7; Doc. 34-1 at 59–60.)

On November 6, 2018, Kaiser executed an affidavit of noncompliance. (Doc. 53 at 3; Doc. 34-1 at 68.) The Board found that a violation existed and entered an order imposing a $50 per day fine, effective November 5, 2018, and accruing each day until the Property was compliant. (Doc. 30-2 at 7.) Robson again appealed the Board's order in state court, but this time the state court affirmed. (Doc. 30-2 at 181–82.) The fine has continued

to grow ever since. (Doc. 53 at 3.) Under the applicable Code provision, once the Property is compliant, Robson may request that the total accrued fine be reduced to 10% of the total, plus administrative costs. (Doc. 32 at 7; Doc. 48 at 2.)

### D. Procedural History

On January 22, 2020, Robson sued the City, the Board, Dehne, and Kaiser. (Doc. 1.) The Court granted in part the City's motion to dismiss, dispatching Robson's claims to the extent (1) they sought relief from the individual defendants in their official capacities as duplicative of the claims against the City and the Board and (2) they sought redress for a violation of Robson's procedural due process rights because the state court had resolved those claims on appeal. (Doc. 12.) Robson then filed an Amended Complaint, asserting five claims. (Doc. 14.) Counts I through IV concern the third citation about the condition of the fence. Counts I and II allege that the City's fine is excessive under the Eighth Amendment of the United States Constitution and under Article I, Section 17 of the Florida Constitution. (*Id.* at 8–11.) Counts III and IV allege that the fence-citation language is unconstitutionally vague under the Federal and Florida Constitutions. (*Id.* at 11–13.) Count V alleges a malicious prosecution claim against Dehne and Kaiser, concerning the first two septic-tank-related citations, although it fails to identify whether the claim arises under federal or state law. (*Id.* at 13–14.)

8

The Defendants now move for summary judgment on all five Counts, arguing that Robson's excessive fines and vagueness claims fail as a matter of law and that his claim for malicious prosecution fails for lack of admissible evidence to support each element. (Doc. 32.) Robson opposes the motion (Doc. 48), and the Defendants reply in turn (Doc. 58).

## II. LEGAL STANDARD

Summary judgment is appropriate if no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A moving party is entitled to summary judgment when the nonmoving party "fail[s] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party must "go beyond the pleadings" and point to evidence in the record that demonstrates the existence of a genuine issue for trial. *Id.* at 324 (quotation omitted). The Court reviews all the record evidence and draws all legitimate inferences in the nonmoving party's favor. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1262 (11th Cir. 2020).

## III. ANALYSIS

The Court divides Robson's claims into three categories: first, whether the fine the City imposed for the third citation is excessive under the United States and Florida

Constitutions; second, whether the operative LDC provision is unconstitutionally vague under the United States and Florida Constitutions; and third, whether Robson put forth sufficient evidence for a jury to conclude that Dehne and Kaiser committed the tort of malicious prosecution.

## A. Excessive Fine Claims

The Eighth Amendment prohibits the government from imposing "excessive fines." U.S. Const. amend. VIII; *see Timbs v. Indiana*, 139 S. Ct. 682, 686–87 (2019) ("This safeguard [against excessive fines], we hold, is 'fundamental to our scheme of ordered liberty,' with 'dee[p] root[s] in [our] history and tradition.' The Excessive Fines Clause is therefore incorporated by the Due Process Clause of the Fourteenth Amendment." (internal citation omitted) (quotation omitted)). The Excessive Fines Clause "limits the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense.'" *Timbs*, 139 S. Ct. at 687 (quoting *United States v. Bajakajian*, 524 U.S. 321, 327–28 (1998)). In other words, payments to the government constitute a fine within the meaning of the Eighth Amendment when "it can only be explained as serving in part to punish." *Austin v. United States*, 509 U.S. 602, 610 (1993). Because neither party contends that the fines under the LDC are anything other than punishment (as opposed to tax revenue, administrative fees, restitution, etc.), the Court assumes that the City imposed these civil fines with a punitive purpose. *See Yates v. Pinellas Hematology &*

10

*Oncology, P.A.*, 21 F.4th 1288, 1308 (11th Cir. 2021) (holding that the Excessive Fines Clause governs treble damages and statutory penalties imposed under the False Claims Act because they are, at least in part, punitive).

Both parties again assume that the Eighth Amendment applies to corporations (and by extension to other business entities like Robson 200, LLC). Although the Supreme Court has never directly so held, *see United States v. Chaplin's, Inc.*, 646 F.3d 846, 851 n.15 (11th Cir. 2011) (assuming without holding that the Eighth Amendment applies to corporations and noting that the Supreme Court had not yet opined on the issue), the Court is inclined to agree that the Excessive Fines Clause applies to corporate entities as well as to natural persons when a fine is imposed for punitive purposes. *See Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 284–85 (1989) (O'Connor, J., concurring in part) ("If a corporation is protected by the Due Process Clause from overbearing and oppressive monetary sanctions, it is also protected from such penalties by the Excessive Fines Clause."); *see also Colo. Dep't of Lab. & Emp. v. Dami Hosp., LLC*, 442 P.3d 94, 99–100 (Colo. 2019) (concluding that the Excessive Fines Clause covers corporations).

The touchstone of the Excessive Fines Clause is proportionality: A fine is excessive if it is "grossly disproportional to the gravity of a defendant's offense." *Bajakajian*, 524 U.S. at 334. Because translating the gravity of an offense into a monetary figure is "not a simple

task," *United States v. 817 Ne. 29th Drive, Wilton Manors*, 175 F.3d 1304, 1309 (11th Cir. 1999), the Supreme Court and the Eleventh Circuit have identified several, non-exhaustive factors in the criminal forfeiture context to assist in that analysis: "(i) whether the defendant is in the class of persons at whom the statute was principally directed; (ii) how the imposed penalties compare to other penalties authorized by the legislature; and (iii) the harm caused by the defendant." *Yates*, 21 F.4th at 1314; *Bajakajian*, 524 U.S. at 338–39.

The proportionality analysis begins with a strong presumption of constitutionality for fines imposed "within the range of fines prescribed by Congress," *817 Ne. 29th Drive*, 175 F.3d at 1309, particularly if they fall "below the maximum statutory fines for a given offense," "as a representative body[] can distill the monetary value society places on harmful conduct," *Yates*, 21 F.4th at 1314 (citing *Chaplin's*, 646 F.3d at 852); *see also Bajakajian*, 524 U.S. at 336 (explaining that "judgments about the appropriate punishment for an offense belong in the first instance to the legislature"). The Eleventh Circuit thus assigns "great weight to the fines approved by [the legislature.]" *Chaplin's*, 646 F.3d at 852.

\* \* \*

The opinions of the Eleventh Circuit bind this Court to presume that fines within the legislature's statutory range are constitutional. But the Court doubts the propriety of doing so. Under this analysis, Congress answers the policy question of what a fine should

12

be and, at least presumptively, the constitutional question of whether it is excessive. This "[s]eems a bit like letting the driver set the speed limit." *Yates*, 21 F.4th at 1318–24 (Newsom, J. concurring) (criticizing the presumption of constitutionality).

The Eleventh Circuit has long read *Bajakajian*—the Supreme Court opinion establishing the "gross disproportionality" standard in the excessive-fines context—as requiring courts to presume fines within the legislatively enacted range pose no Excessive-Fines-Clause problem. *See Chaplin's*, 646 F.3d at 852 (granting a "strong presumption" of constitutionality to fines that fall "below the maximum statutory fines for a given offense"); *817 Ne. 29th Drive*, 175 F.3d at 1309 (same). But *Bajakajian* mandates no such "strong presumption." Instead, *Bajakajian* relied on two preliminary considerations to explain why it ultimately held that the constitutional standard must be "gross disproportionality." 524 U.S. at 335–36. First, it noted that "judgments about the appropriate punishment for an offense belong in the first instance to the legislature." *Id.* at 336. That statement expresses no "strong presumption" of constitutionality; it simply recognizes that Congress exercises its political judgment when enacting criminal laws and attendant punishments. Second, it acknowledged that "any judicial determination regarding the gravity of a particular criminal offense will be inherently imprecise." *Id.* Given these two considerations, the Supreme Court rejected a "strict proportionality" standard. *Id.* Instead, it instructed "district courts in the first instance" to compare the fine to the gravity of the offense and conclude it is

13

unconstitutional only if they are "grossly disproportional." *Id.* at 336–37. It never required lower courts to apply deference anew in each case to the legislatively enacted fine range.

In addition to extending *Bajakajian* beyond its holding, presuming the constitutionality of legislative determinations creates a more fundamental problem: it delegates the Article III judicial power to interpret and apply the law. "[T]he judicial power, as originally understood, requires a court to exercise its *independent judgment* in interpreting and expounding upon the laws." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 119 (2015) (Thomas, J., concurring) (emphasis added). No less the Constitution. And though many have rightly critiqued deference to administrative agencies' interpretations of federal law, this Court sees no less of a problem with "wrest[ing] from Courts the ultimate interpretative authority to 'say what the law is,' and hand[ing] it over to [Congress]." *Michigan v. EPA*, 576 U.S. 743, 762 (2015) (Thomas, J., concurring) (internal citation omitted) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)). Indeed, the Founding generation agreed that "only the judicial interpretation would be considered authoritative in a judicial proceeding." *Perez*, 575 U.S. at 119–20 (Thomas, J., concurring); *see The Federalist No. 78* (Alexander Hamilton) (arguing that "[t]he interpretation of the laws is the proper and peculiar province of the courts"); *The Anti-Federalist No. 81* (Brutus) (explaining with disapproval that, in Article III, "the courts are vested with the supreme and uncontroulable power, to determine, in all cases that come before them, what

14

the constitution means"); *The Anti-Federalist No. 46* (An Old Whig) (explaining that a bill of rights enables "appeal to the judicial branch of the government to protect us by their judgments" from the legislature's "pretensions" to power).

The Excessive Fines Clause is not exempt from this principle. In *Bajakajian*, the Supreme Court explained that the Eighth Amendment is derived from the English Bill of Rights and Magna Carta. *See* 524 U.S. at 335. And that the English "prohibition against excessive fines was a reaction to the abuses of the King's judges." *Id.* Thus, these English documents checked *judicial* power—and specifically that of the royal courts—to impose fines at the political behest of the monarch. *See id.* at 335; *817 N.E. 29th Drive*, 175 F.3d at 1309 n.8 (explaining that courts set and imposed fines in the pre-revolution era). As such, the original check was not on legislatures. It was on courts that issued fines to punish the executive's political enemies.

Today, though, it is Congress and the Executive that set and impose civil fines in most instances. And unlike the King and his courts, Article III judges enjoy complete independence from the Executive in our constitutional system. But the lesson of English history that the power to impose fines may be abused for political ends remains a relevant one. If modern federal courts presume that the fines of the political branches are lawful, they turn that lesson upon its head, eliminating much of the check that law—whether it be

the English or American Bill of Rights—is meant to have upon the power to fine the People.

In addition to its suspect footing in both precedent and principle, the strong presumption accorded statutorily authorized fines is an outlier in constitutional interpretation. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021) (explaining that a congressional enactment "does not relieve courts of their responsibility to independently decide" what the Constitution requires). The Constitution contains other ostensibly subjective standards applicable to the People's individual rights besides the adjective "excessive," such as "unreasonable" in the Fourth Amendment search-and-seizure context or "cruel and unusual" in the Eighth Amendment punishment context. Yet the Supreme Court employs traditional tools of constitutional interpretation without presuming the propriety of legislatively condoned searches or punishment. *See Baldwin v. United States*, 140 S. Ct. 690, 691 (2020) (Thomas, J., dissenting from denial of certiorari) (explaining that, even if a legal text is ambiguous, the judicial role "include[s] the power to resolve these ambiguities over time"). This Court sees no reason why courts should interpret the Excessive Fines Clause differently.

\*    \*    \*

In addition to deference to the legislature as the starting point and proportionality as the lodestar for the Excessive-Fines-Clause analysis, courts ordinarily regard the fine as

16

the amount imposed per day when the offender knowingly violates the law, rather than the total cumulative fine after the offender permits it to grow. *See Moustakis v. City of Fort Lauderdale*, 338 F. App'x 820, 822 (11th Cir. 2009) (per curiam) (explaining the fine is "properly characterized" as the per-day amount, not the total accumulated); *see also Duisberg v. City of Austin*, No. 07-20-00171, 2020 WL 6122951, at *4 (Tex. App. Oct. 16, 2020) (rejecting an excessive fines claim where the plaintiff asked the court "to countenance his continual violations of housing codes by striking down the penalty he permitted to accrue by his own knowing inaction").

Similarly, under the Florida Constitution, "[e]xcessive fines . . . are forbidden." Fla. Const., art. I, § 17. A "statutorily authorized civil fine will not be deemed so excessive as to be cruel and unusual unless it is so great as to shock the conscience of reasonable men or is patently and unreasonably harsh and oppressive." *Locklear v. Fla. Fish & Wildlife Conservation Comm'n*, 886 So. 2d 326, 329 (Fla. 5th DCA 2004) (citing *Amos v. Gunn*, 94 So. 615 (1922)). Tracking with the Eighth Amendment analysis, these requirements include the "principle of proportionality." *State v. Cotton*, 198 So. 3d 737, 741, 743 (Fla. 2d DCA 2016) (quoting *Bajakajian*, 524 U.S. at 334). Florida courts also apply the same excessiveness factors to excessive fines claims under the United States and Florida constitutions. *See, e.g.*, *Gordon v. State*, 139 So. 3d 958, 960 (Fla. 2d DCA 2014). And like the Eighth Amendment context, Florida courts "grant substantial deference to the

legislature's determination of the appropriate punishment for an offense." *Browning v. Angelfish Swim Sch., Inc.*, 1 So. 3d 355, 359 (Fla. 3d DCA 2009) (quoting *Riopelle v. Dep't of Fin. Servs.*, 907 So. 2d 1220, 1223 (Fla. 1st DCA 2005)); *Cotton*, 198 So. 3d at 743 ("A fine within the permissible range otherwise authorized by the legislature is presumptively constitutional.").

The City argues that Robson's excessive-fine claims fail because the fine is properly characterized as the amount per day, rather than the total amount accrued for purposes of the analysis, and the amount per day—$50—was well-within the range set out by the Florida legislature. (Doc. 32 at 8–11.)

Section 162.09 of the Florida Statutes provides that a local government may impose a fine for each day a property is in violation of a local code, provided the fine does not exceed $250 per day for a first violation, and $500 dollars per day for a repeat violation. *See* § 162.09(1), (2)(a), Fla. Stat. As an example of how this statute applies, in *Moustakis*, the Eleventh Circuit upheld a $150 per day fine by the City of Fort Lauderdale on a couple who violated the city code by failing to bring their home into compliance. *See* 338 F. App'x at 821. Even though the fine eventually reached $700,000 and exceeded the value of the home, the court concluded it was not excessive because the $150 per day amount was well-within the range prescribed by the legislature in § 162.09 and the large amount "was created by [the plaintiffs'] failure to bring the house into compliance with the Code each

18

day for 14 years," which made it "directly proportionate to the offense." *Id.* at 822. To be sure, *Moustakis* is unpublished and the Court has been unable to locate (and the Defendants do not cite) published Eleventh Circuit opinions addressing how the Excessive Fines Clause applies to the accumulation of fines based on the same underlying conduct.

But as further persuasive value, other courts in this district have repeatedly rejected excessive fines claims where the fines are "relatively small" and within the range prescribed by the legislature, and the total accrued fine is largely based on the plaintiffs' "refusal to comply with the code" for an extended period. *Conley v. City of Dunedin*, No. 08-cv-1793, 2010 WL146861, at *2–5 (M.D. Fla. Jan 11, 2010) (Bucklew, J.) (upholding a $50 and $100 per day fine for parking an oversized truck in a residential driveway where the fine had accrued to $198,000); *see Lindbloom v. Manatee Cnty.*, No. 18-cv-2642, 2019 WL 2503145, at *8 (M.D. Fla. June 17, 2019) (Jung, J.) (denying an excessive fines claim for a $50 per day fine for yard trash and an unsound roof that had accumulated to around $5,000).

Here, the operative fine against Robson is "properly characterized" as $50 per day. *Moustakis*, 338 F. App'x at 822; (Doc. 30-2 at 7). The first order of analysis (although often unstated) is determining what the appropriate unit of prosecution—conduct that constitutes a new and discrete act or omission independently giving rise to liability—is for purposes of the excessive fines analysis in the local-ordinance context. *See United States v.*

*Hinkeldey*, 626 F.3d 1010, 1013 (8th Cir. 2010) ("A unit of prosecution is 'the aspect of criminal activity that [the legislature] intended to punish.'" (quotation omitted)). In other words, may the City punish Robson for the disrepair of its fence only (a static condition) or for the daily refusal to mend it (repeated omissions)? The Eleventh Circuit, at least implicitly, answered the question in *Moustakis* as the latter. And given the similarities between *Moustakis* and the situation here—both plaintiffs knowingly disregarded the code violations and were on notice that the fines daily accrued—this Court agrees that the proper unit of prosecution is the daily refusal to repair the fence. *But see Brown v. Transurban USA, Inc.*, 144 F. Supp. 3d 809, 838–39 (E.D. Va. 2015) (fine accumulated from $4.95 to $3,413.75, but plaintiffs did not receive notice that the fine existed or was increasing by the day); *Ficken v. City of Dunedin*, No. 19-cv-1210, 2021 WL 1610408, at *3, *18, *23 (M.D. Fla. Apr. 26, 2021) (Honeywell, J.) (upholding a $500 per day fine for violating the city's prohibition on overgrowth that had accrued to $29,000 even though the plaintiff arguably lacked initial notice of the fines or that the fines were accruing).

Because the daily fine amount of $50 is at the low end of the permissible range set by the legislature in section 162.09, Florida Statutes, the City is entitled to a "strong presumption" that it is not constitutionally excessive. *Chaplin's*, 646 F.3d at 852. And the "refusal to comply" with a fine over a long period, such that the fine accrues to a substantial amount, does not give the defendant the ability to turn around and argue that the large

total fine has become excessive. *See Conley*, 2010 WL146861, at *5. Otherwise, there would be an incentive to not comply with fines for lengthy periods until they eventually grow to an unconstitutional amount. Robson's repeat failure over the course of several years to bring its fence into compliance does not render the modest $50 per day fine unconstitutionally excessive. Therefore, the Court begins with a presumption that the fine complies with the federal and state constitutions.

After acknowledging the presumption, courts ordinarily turn to the three proportionality factors to assess whether a fine is nonetheless constitutionally excessive. *See Bajakajian*, 524 U.S. at 338–39. Although this tripart test initially arose in the criminal forfeiture context, the Court follows the lead of other district courts and applies them in this context. *See Ficken*, 2021 WL 1610408, at *24 (noting the "obvious distinctions between the facts of [an excessive fines challenge to section 162.09] and a forfeiture" but applying the three-factor proportionality test out of "an abundance of caution"); *see also Gordon*, 139 So. 3d at 960–64 (applying the factors to an excessive fine analysis of a Florida criminal law). The City rests heavily on the presumption of constitutionality. (Doc. 32 at 8–11.) In so doing, it fails to acknowledge that a presumption can be rebutted and thus offers no test to apply to assess whether Robson rebutted the presumption.

First, Robson unquestionably falls "in the class of persons at whom the statute was principally directed." *Yates*, 21 F.4th at 1314. The LDC applies to any "building, structure,

or land located within the [C]ity" and requires those to be "in conformity with the regulations" specified in the LDC. LDC § 1.1.2. Robson's property—specifically its fence—is undisputedly governed by the LDC. *See* LDC § 1.1. And section 162.09, Florida Statutes, applies to local code "violator[s]" and "repeat violat[ors]." Here, the Board concluded (and the state court affirmed) that Robson violated LDC § 4.4.1(i), and it squarely falls within the regulated entities governed by the relevant statutes.

The second factor compares "the imposed penalt[y]" with "other penalties authorized by the legislature." *Yates*, 21 F.4th at 1314. Section 162.09 provides that fines for first-time violations "shall not exceed $250 per day." Here, the Board's fine of $50 per day represents 20% of the maximum allowed. Compared to "much greater fines" imposed under the same Florida statute for similar violations and affirmed by the Eleventh Circuit, *Lindbloom*, 2019 WL 2503145, at *8, the second factor here likewise points to the conclusion that the fine is not "grossly disproportional" to the gravity of Robson's offense, *See United States v. Sperrazza*, 804 F.3d 1113, 1128 (11th Cir. 2015).

Finally, the harm caused by Robson here is its repeated violations of LDC § 4.4.1(i), requiring "all [f]ences and walls [to] be maintained in sound condition." (Doc. 14-5 at 1.) Among other things, the LDC's purpose is to "provide more adequately for the safety and convenience of access to property." LDC § 1.1.6. This is consonant with Chapter 162 of the Florida Statutes, which purports to "promote, protect, and improve the health, safety,

22

and welfare" of citizens of the City through the imposition of fines and administrative penalties to enforce the City's codes and ordinances. § 162.02, Fla. Stat. Additionally, the City's purpose for enforcing the LDC is "to ensure safe, attractive neighborhoods through code compliance." (Doc. 30-2 at 12.) As Kaiser stated in her deposition, "code enforcement is to keep propert[y] values up," and serves the purposes of "beautification," "safety," "welfare," and "to keep nuisance properties at bay." (Doc. 41 at 20.) The LDC's requirement that fences be maintained in a "sound condition" furthers these purposes through (among other reasons) increased security and privacy of Robson's tenants and avoids harm to passersby through unleashed pets or debris from the unsound fence. As Dehne testified in his deposition, LDC § 4.4.1(i) serves not only "ornamental" purposes but also "protection" purposes. (Doc. 39 at 150.) The less tangible—yet no doubt still important—harm caused by Robson's dilapidated fence is the aesthetic injury to the public. It follows that the above harm warrants $50 per day, a relatively minor amount.

Therefore, the City's $50 per day fine of Robson is not grossly disproportional under the Eighth Amendment or the Florida Constitution. Accordingly, summary judgment is granted to the City on the federal and state excessive fine claims (Counts I and II).

### B. Vagueness Claims

The City argues that Robson's vagueness claims are precluded by *Rooker-Feldman* and res judicata. Alternatively, the City argues that Robson's vagueness claims fail on the

merits because the phrase "sound condition" is not unconstitutionally vague and can be readily ascertained. (Doc. 32 at 15–17.)

Rooker-Feldman almost certainly does not preclude Robson's vagueness claims, as it is not "challeng[ing] the state-court decision itself, rather than the statute or law underlying that decision." *Nash v. Fifth Dist. Ct. of App.*, 806 F. App'x 870, 872 (11th Cir. 2020) (per curiam) (citing *May v. Morgan Cnty.*, 878 F.3d 1001, 1004 (11th Cir. 2017) (per curiam)). As a result, its vagueness challenges likely do not "amount to a direct attack on the underlying state court decision." *Behr v. Campbell*, 8 F.4th 1206, 1212 (11th Cir. 2021) (quotation omitted). On the other hand, res judicata almost certainly bars Robson's vagueness claims, as the state court decided that "[Robson] was afforded procedural due process" and was "provided with fair notice of what was prohibited by the Code." (Doc. 30-2 at 182 (citing *Sieniarecki v. State*, 756 So. 2d 68, 75 (Fla. 2000)).) But the parties fail to delineate how the above doctrines apply differently (if at all) to the as-applied and facial vagueness challenges, creating unnecessarily cumbersome questions of law. Turning to the merits first then, the Court concludes that both the as-applied and facial vagueness claims fail.

The Fourteenth Amendment prohibits "any state" from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV, § 1. "It is, by now, a 'basic principle of due process that an enactment is void for vagueness if its

prohibitions are not clearly defined.'" *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1349 (11th Cir. 2021) (quoting *Wollschlaeger v. Governor, State of Fla.*, 848 F.3d 1293, 1319 (11th Cir. 2017) (en banc)). Stated otherwise, a criminal law violates the Due Process Clause if it is "so vague that it fails to give ordinary people fair notice of the conduct it punishes." *Johnson v. United States*, 576 U.S. 591, 595 (2015). "[But a] civil statue is unconstitutionally vague only if it is so indefinite as 'really to be no rule or standard at all.'" *Burns*, 999 F.3d at 1349 (quoting *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1310 (11th Cir. 2009)). "Standard economic regulations, including zoning ordinances, need only pass 'a less strict vagueness test.'" *Id.* (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982)).[1]

Similarly, "[t]he standard for testing vagueness under Florida law is whether the statute gives a person of ordinary intelligence fair notice of what constitutes forbidden conduct. 'The language of the statute must 'provide a definite warning of what conduct' is required or prohibited, 'measured by common understanding and practice.'" *Sieniarecki*, 756 So. 2d at 74 (internal citations omitted) (quoting *Brown v. State*, 629 So. 2d 841, 842–43 (Fla. 1994)). "A statute is not unconstitutionally vague merely because it is subject to different interpretations." *Jones v. Williams Pawn & Gun, Inc.*, 800 So. 2d 267, 270 (Fla.

---

[1] In free speech cases, the vagueness standard is more exacting because "rigorous adherence" to the requirements of the Due Process Clause is "necessary to ensure that ambiguity does not chill protected speech." *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012).

4th DCA 2001). And "[a]ny doubts as to the constitutionality of the statute must be resolved in favor of its constitutionality." *Id.*

Although Robson advances both facial and as-applied vagueness challenges to LDC § 4.4.1, a party "'who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Holder v. Humanitarian L. Project*, 561 U.S. 1, 18–19 (2010) (quoting *Hoffman Ests.*, 455 U.S. at 495). So, if the Court determines that the phrase "sound condition" in LDC § 4.4.1 is not vague as applied to Robson, its facial challenge must fail too. *See Parker v. Levy*, 417 U.S. 733, 756 (1974) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness."); *accord High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225, 1227–28 (11th Cir. 1982).

LDC § 4.4.1(i) is akin to economic regulations like zoning, so the Court applies the less strict version of the vagueness test. Beginning with the ordinance's text, LDC § 4.4.1(i) provides: "Fences and walls, whether required or optional, shall be maintained in sound condition." (Doc. 14-5 at 1.) Robson claims that the phrase "sound condition" is unconstitutionally vague because it does not give a person of ordinary intelligence a reasonable opportunity to understand what it prohibits.

But a quick skim of readily available dictionary definitions belies this argument. Black's Law Dictionary defines "sound" when referring to property as "good" or

"marketable." (11th ed. 2019). And Merriam-Webster defines "sound" as "free from flaw, defect, or decay," or "solid, firm," "stable," "secure, [and] reliable." *Sound*, Merriam Webster, https://www.merriam-webster.com/dictionary/sound (last visited March 22, 2022). And "condition" is defined as "a state of being." *Condition*, Merriam Webster, https://www.merriam-webster.com/dictionary/condition (last visited March 22, 2022). Taken together, LDC § 4.4.1(i) required Robson maintain the fence in the "state of being" "free from flaw, defect, or decay"—in other words, "good," "marketable," and "stable."

If any ambiguity remains as to the meaning of LDC § 4.4.1(i) as applied to Robson, it is extinguished here by the City's written violation notice that specifically directed Robson to "replace broken or damaged boards" and "repair areas of the fence that were leaning or coming apart, etc." (Doc. 14-5 at 1.) Robson does not put forth a meaningful argument that § 4.4.1(i)'s language together with the written notice would leave a person of "ordinary intelligence" without a reasonable understanding of the conduct that the ordinance prohibits. (Doc. 48 at 15–16.)

Robson further presses that "the testimony of seven individuals involved on the Defendants' side reveals internal differing understandings of what the term 'sound condition' language at the heart of this case means." (Doc. 48 at 16 (emphasis omitted).) But the Constitution does not require that ordinances be written with absolute clarity or "mathematical certainty." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). Instead,

it must be "clear what the ordinance as a whole prohibits." *Id.* And in the context of a civil law that does not implicate the First Amendment, a vagueness challenge will succeed only if the law is "so indefinite as 'really to be no rule or standard at all.'" *Burns*, 999 F.3d at 1349 (quoting *Leib*, 558 F.3d at 1310). The text of the ordinance together with the written notice and photographs highlighting the "unsound" conditions here can hardly be considered "no rule or standard at all." The Court concludes that LDC § 4.4.1(i) is not vague as applied to Robson, and by extension, it is not void on its face either. *See Holder*, 561 U.S. at 18–19.

Therefore, the Court grants summary judgment on Robson's vagueness claims (Counts III and IV) because they fail on the merits.

## C. Malicious Prosecution

The City lastly argues that Robson's malicious prosecution claim against Dehne and Kaiser fails as a matter of law because, among other things, the septic-tank citations (LCE17-00229 and LCE18-03721) were supported by probable cause and Dehne and Kaiser are entitled to qualified immunity. (Doc. 32 at 18–25.) The Court agrees.

Under Florida law, to prove a malicious prosecution claim[2] the plaintiff must show "(1) an original judicial proceeding was commenced or continued against him, (2) the

---

[2] Because Robson does not argue that a seizure occurred under the Fourth Amendment, he cannot establish a federal malicious prosecution claim. *See Cutino v. Untch*, 79 F. Supp. 3d 1305, 1314 (S.D. Fla. 2015) ("To prove a federal malicious-prosecution claim, a plaintiff must establish (1) the elements of the

defendants were the legal cause of that proceeding, (3) the termination of the original proceeding constituted a bona fide termination of the proceeding in the plaintiff's favor, (4) there was an absence of probable cause for the original proceeding, (5) malice existed on the part of the defendants, and (6) the plaintiff suffered damages as a result of the original proceeding." *Cutino v. Untch*, 79 F. Supp. 3d 1305, 1314 (S.D. Fla. 2015); *accord Durkin v. Davis*, 814 So. 2d 1246, 1248 (Fla. 2d DCA 2002).

Robson's malicious prosecution claim against Dehne and Kaiser fails because Robson cannot establish an absence of probable cause for either the first septic tank citation (LCE17-0229) or the second septic tank citation (LCE18-03721). "Probable cause to institute civil proceedings requires no more than a 'reasonabl[e] belie[f] that there is a chance that [a] claim may be held valid upon adjudication.'" *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 62–63 (1993). "'[I]t is not necessary to show that the instigator of a lawsuit was certain of the outcome of the proceeding, but rather that he had a reasonable belief, based on the facts and circumstances known to him, in the validity of the claim." *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1301, 1303 (11th Cir. 2019) (quotation omitted). Courts inquire as to "whether all the facts and circumstances available" gave the defendant "a reasonable belief that it had a tenable . . . claim." *Id.* A malicious prosecution claim is ripe for summary judgment where the non-

---

common-law tort of malicious prosecution and (2) a violation of his Fourth Amendment right to be free from unreasonable seizures.").

moving plaintiff fails to bring forward significant probative evidence of the absence of probable cause. *See Zargari v. United States*, No. 13-23806-civ, 2015 WL 1587942, at *5– 9 (S.D. Fla. April 9, 2015).

Turning to the first septic tank citation (LCE17-0229), the undisputed evidence shows the citation was supported by probable cause. The case file includes photos of standing dark water under the mobile home, a Health Department inspection report indicating there was raw sewage on the ground, and deposition testimony indicating that the septic tanks had standing sewage water around them. (Doc. 36-1 at 150–55; *id.* at 5– 6; Doc. 40 at 35–37, 46–48, 90–92.) Mike Ingram, Averitt Septic's project manager who pumped the tank following the citation, testified that he found standing water around the septic tank and called a crew to pump it immediately because he did not want to risk any children playing near the water. (Doc. 40 at 45–48, 91.) Robson disputes that the water on the ground observed by the inspectors, the Health Department, and the employees of Averitt Septic was indeed "sewage" because no one tested the liquid to confirm it was sewage. (Doc. 48 at 2.) Robson contends that the water "*could have*" come from a source other than the septic tanks. But probable cause does not require certainty or even more likely than not that the standing water was sewage, much less exclusion of all other "reasonable doubts" that it was. To meet the probable cause standard the City officials needed only "a reasonable belief, based on the facts and circumstances known to [them]"

that the citation was valid. *DeMartini*, 942 F.3d at 1303 (quotation omitted). Based on the undisputed facts, the City officials had at least "a reasonable belief" that the standing water was "sewage," which is enough for probable cause.

Similarly, the second septic tank citation (LCE18-03721) was also supported by probable cause. Testimony from several residents and from Code Enforcement Officer David Anders makes it clear Kaiser and Dehne had at least a "reasonable belief" that various mobile homes on Robson's property had sewage back-ups, malodourous smells around the septic tanks, and toilet paper in the clean-out area under the mobile home. (Doc. 32 at 4; Doc. 37 at 57–59, 62, 77–79.) Kaiser also had conversations with plumbers who visited Robson's property and received follow-on complaints from other tenants indicating additional plumbing problems along the lines of those observed by Anders. (Doc. 32 at 5; Doc. 41 at 147–48; Doc. 34-1 at 18–23.) Robson does not meaningfully dispute this evidence, (Doc. 48 at 17–18), which is more than enough to support a "reasonable belief" on the part of Kaiser and Dehne that Robson was violating LDC § 46-1. Because there is no material dispute of fact that there was probable cause, Robson's malicious prosecution claim fails.

In the alternative, Kaiser and Dehne are entitled to qualified immunity on the malicious prosecution claim. Robson does not dispute that Kaiser and Dehne were acting within the scope of their discretionary authority during the events at issue, meaning the

burden shifts to Robson to show that they are not entitled to qualified immunity. *See Jacoby v. Baldwin Cnty.*, 835 F.3d 1338, 1344 (11th Cir. 2016). In the context of a malicious prosecution claim, to receive qualified immunity, an officer need only have had *arguable* probable cause. *See Grider v. City of Auburn*, 618 F.3d 1240, 1257 (11th Cir. 2010). "Arguable probable cause exists where 'reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed probable cause existed. . . ." *Id.*

Based on the facts recounted above, even if Kaiser and Dehne lacked actual probable cause, they certainly had arguable probable cause to support both of the original citations. There is, at the very least, an argument that a reasonable officer in their position could have formed a "reasonable belief" that Robson's property was in violation of the LDC.

Therefore, summary judgment is granted to the City on Robson's malicious prosecution claim because probable cause supported the original citations, or, in the alternative, the City officials are entitled to qualified immunity on the malicious prosecution claim.

## IV.   CONCLUSION

Accordingly, the following is **ORDERED**:

1.      Defendants' Motion for Summary Judgment (Doc. 32) is **GRANTED**.

2.      The Clerk is directed to enter judgment in favor of Defendants on all Counts,

terminate any pending motions and deadlines, and close this case.

**ORDERED** in Tampa, Florida, on March 24, 2022.

Kathryn Kimball Mizelle
United States District Judge